<u>**NOT FOR PUBLICATION**</u>

<u>**UNITED STATES DISTRICT COURT**</u>
<u>**FOR THE DISTRICT OF NEW JERSEY**</u>

_____
                                        :
MARKO BEY,                              :
                                        :
        Petitioner,                     :
                                        :          Civil Action No. 00-1155 (JAG)
            v.                          :
                                        :                 **OPINION**
MICHELLE R. RICCI, et al.,              :
                                        :
        Respondents.                    :
_____ :


<u>**GREENAWAY, JR., U.S.D.J.**</u>

        This matter comes before this Court on the petition of Marko Bey ("Petitioner" or "Bey"),

seeking the issuance of a writ of habeas corpus, pursuant to 28 U.S.C. § 2254.  For the reasons

set forth below, this petition will be denied.

<u>**Procedural History**</u>

        On April 26, 1983, a Monmouth County grand jury returned an indictment charging

Petitioner (Monmouth County Indictment No. 905-7-83) in a seven count indictment with –

Count One, "murder in that [Petitioner] did purposely or knowingly cause the death of or serious

bodily injury resulting in the death of Carol Peniston" by his own conduct, in violation of N.J.

STAT. ANN. §§ 2C:11-3(a)(1) and (2); Count Two, felony murder, in violation of N.J. STAT.

ANN. § 2C:11-3(a)(3); Count Three, first degree kidnapping, in violation of N.J. STAT. ANN.

§§ 2C:13-1(b)(1) and (2); Count Four, second degree aggravated assault, in violation of N.J.

1

STAT. ANN. § 2C:12-1(b)(1); Count Five, first degree aggravated sexual assault, in violation of

N.J. STAT. ANN. §§ 2C:14-2(a)(3) and (6); Count Six, first degree robbery, in violation of N.J.

STAT. ANN. § 2C:15-1; and Count Seven, third degree theft, in violation of N.J. STAT. ANN.

§ 2C:20-3(a).[1]  (Indictment No. 905-7-83, attached as Exhibit 16a to Pet. for Writ of Habeas

Corpus Pursuant to 28 U.S.C. § 2254 by State Prisoner Under Sentence of Death [hereinafter

"Habeas Pet."] 1a-5a.)

On September 27, 1984, a jury convicted Marko Bey of the purposeful or knowing

murder of Carol Peniston, as well as the remaining six counts from the indictment, including

felony murder, kidnapping, aggravated assault, aggravated sexual assault, robbery, and theft.

After a brief penalty phase hearing, the jury returned a verdict finding the existence of two

aggravating factors[2] and no mitigating factors[3] on September 28, 1984.  The trial court

─────────────

[1] Petitioner was indicted on July 5, 1983 for the murder of Cheryl Alston.  After trial, the jury returned a sentence of death on December 13, 1983.  Following Petitioner's conviction for the murder of Cheryl Alston, the State of New Jersey gave notice of its intention to rely on the Alston conviction as an aggravating factor in the Peniston murder trial, pursuant to N.J. STAT. ANN. § 2C:11-3c(4)(a).  Petitioner opposed this request.  The trial court judge, the Honorable John P. Arnone, who presided over Petitioner's trials for both murders, ruled in favor of the State and Petitioner appealed.  In response to Petitioner's interlocutory appeal, the Supreme Court of New Jersey held that a defendant's prior conviction could not be used as an aggravating factor when direct appellate review of the conviction had not been exhausted.  State v. Bey, 477 A.2d 315, 317, clarified 483 A.2d 185 (N.J. 1984) ("Bey I").  Therefore, Petitioner's conviction for the Alston murder was not used as an aggravating factor in the first penalty phase trial.

[2] The two aggravating factors were: (1) that the murder was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim, N.J. STAT. ANN. § 2C:11-3c(4)(c); and (2) that the murder was committed during the commission of, or an attempt to commit, or flight after committing, sexual assault or robbery, N.J. STAT. ANN. § 2C:11-3c(4)(g).  State v. Bey, 548 A.2d 887, 898 (N.J. 1988) ("Bey II").

[3] The four proposed mitigating factors that were rejected were: (1) that Petitioner was under the influence of extreme mental or emotional disturbance insufficient to constitute a defense to prosecution, N.J. STAT. ANN. § 2C:11-3c(5)(a); (2) that Petitioner was eighteen years

2

subsequently sentenced Bey to death.

Pursuant to N.J. Cᴛ. R. 2:2-1(a)(3) and N.J. Sᴛᴀᴛ. Aɴɴ. § 2C:11-3e, Petitioner appealed his 1984 conviction and sentence directly to the Supreme Court of New Jersey.  On August 2, 1988, the Supreme Court of New Jersey affirmed the Peniston murder conviction, but reversed and remanded Petitioner's death sentence, concluding that the jury instruction requiring unanimity for finding mitigating factors violated Mills v. Maryland, 486 U.S. 367 (1988).  State v. Bey, 548 A.2d 887 (N.J. 1988) ("Bey II").[4]

In a separate opinion, the Supreme Court of New Jersey reversed and remanded Petitioner's sentence for the Alston murder, holding that Petitioner was ineligible for the death penalty because he was a juvenile at the time of the Alston murder.  State v. Bey, 548 A.2d 846, 849 (N.J. 1988).

In February 1990, Petitioner's counsel filed a motion seeking a new guilt-phase trial based on the Supreme Court of New Jersey's holding in State v. Gerald, 549 A.2d 792 (N.J.

---

old at the time of the murder, N.J. Sᴛᴀᴛ. Aɴɴ. § 2C:11-3c(5)(c); (3) that Petitioner's capacity to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of the law was significantly impaired as a result of intoxication, but not to a degree sufficient to constitute a defense to prosecution, N.J. Sᴛᴀᴛ. Aɴɴ. § 2C:11-3c(5)(d); and (4) any other factors, including Petitioner's childhood and upbringing, that would be relevant to his character or record or to the circumstances of the offense, N.J. Sᴛᴀᴛ. Aɴɴ. § 2C:11-3c(5)(h).  Bey II, 548 A.2d at 898.

[4] The Supreme Court of New Jersey issued five decisions involving the Peniston murder and Petitioner's death sentence, all captioned State v. Bey, which will be abbreviated as follows:

Bey I:      477 A.2d 315 (N.J. 1984) (interlocutory appeal of change of venue and use of
            prior murder as an aggravating factor);
Bey II:     548 A.2d 887 (N.J. 1988) (direct appeal of Peniston conviction and death
            sentence);
Bey III:    610 A.2d 814 (N.J. 1992) (direct appeal of second Peniston death sentence);
Bey IV:     645 A.2d 685 (N.J. 1994) (proportionality review); and
Bey V:      736 A.2d 469 (N.J. 1999) (appeal of post-conviction relief hearing).

1988),[5] (Tr. of Trial Proceedings, Feb. 26, 1990, attached as Exhibit 39 [hereinafter "Ex. 39"] to Habeas Pet. 2:5–14:16), arguing that the jury was not instructed on the difference between murder with intent to kill and serious bodily injury murder, (Ex. 39 11:12–16).  The trial court denied the motion, noting that in Petitioner's case — unlike Gerald —Petitioner's intent was clear.  That is, based on "the 'uncontroverted evidence [] that Ms. Peniston died as a result of ligature strangulation,'" and the fact that Petitioner "accompanied the strangulation '[with] a severe beating which rendered the victim helpless and motionless,'" the trial court "concluded that there was no way the jury could rationally have determined that the defendant had 'the purpose or knowledge to cause only serious bodily injury.'"  (Op. Summarily Den. Pet. For Post-Conviction Relief, Mar. 28, 1996 attached as Exhibit 16a [hereinafter "Ex. 16a"] to Habeas Pet. 78a (quoting Op. Den. Mot. for New Trial, March 26, 1990 (attached as Pet'r's App. in Supp. of Pet. for Habeas Corpus vol. I [hereinafter "App. Vol I"]) 97a, 101a).)

The Supreme Court of New Jersey affirmed, noting that "defendant's strangulation of the victim and the degree of force applied to the victim's head and chest make it simply 'inconceivable that defendant was not 'practically certain' that his action would kill the [victim].'" Bey III, 610 A.2d at 580 (quoting State v. Rose, 576 A.2d 235, 236 (N.J. 1990)).

The second Peniston penalty phase commenced before a jury on August 20, 1990.  The

---

[5] In Gerald, the Supreme Court of New Jersey held that only those who were convicted of purposefully or knowingly causing death — as opposed to being convicted of knowingly causing "serious bodily injury resulting in death" — could be sentenced to death.  Gerald, 549 A.2d at 807.

State sought to prove two aggravating factors.[6]  The defense asserted four mitigating factors.[7]

The jury found the prior murder and contemporaneous felony aggravating factors outweighed

two of the factors found in mitigation.[8]  Accordingly, the jury returned a verdict of death on

September 11, 1990.

On July 28, 1992, the Supreme Court of New Jersey affirmed the second Peniston death

sentence, State v. Bey, 610 A.2d 814 (N.J. 1992) ("Bey III"), cert. denied, 513 U.S. 1164 (1995),

and subsequently held that the death sentence was not disproportionate, State v. Bey, 645 A.2d

685 (N.J. 1994) ("Bey IV"), cert. denied, 513 U.S. 1164 (1995).

On September 7, 1995, Petitioner filed a petition for post-conviction relief ("PCR

petition") in Monmouth County Superior Court.  On March 28, 1996, Judge Arnone denied the

PCR petition without conducting an evidentiary hearing.  Petitioner appealed to the Supreme

Court of New Jersey and moved for a summary reversal.  The Supreme Court of New Jersey

granted a partial remand ordering that an evidentiary hearing be held on two ineffective

assistance of counsel claims.  (Order dated June 24, 1996, Ex. 16a at 141a.)  Judge Arnone held

---

[6] The two aggravating factors were (1) that Petitioner was previously convicted of a murder, N.J. STAT. ANN. § 2C:11-3c(4)(g), and (2) that the murder was committed in the course of a robbery and/or sexual assault, N.J. STAT. ANN. § 2C:11-3c(4)(g).

[7] The four mitigating factors were: (1) that Petitioner was under the influence of extreme mental or emotional disturbance, N.J. STAT. ANN. § 2C:11-3c(5)(a); (2) Petitioner's age at the time of the murder, N.J. STAT. ANN. § 2C:11-3c(5)(c); (3) that Petitioner's capacity to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of the law was significantly impaired as a result of intoxication, N.J. STAT. ANN. § 2C:11-3c(5)(d); and (4) any other factors, including Petitioner's childhood and upbringing, that would be relevant to his character or record or to the circumstances of the offense, N.J. STAT. ANN. § 2C:11-3c(5)(h).

[8] The vote on the mitigating factors was: (a) 2 yes, 10 no, (b) 0 yes, 12 no, (c) 0 yes, 12 no, (d) 6 yes, 6 no.  (Indictment No. 905-83, Jury Verdict Form 2, Ex. 16a at 14a.)

an evidentiary hearing from January 14 through February 15, 1997. He again denied the PCR

petition in an Order dated September 15, 1997, rejecting both ineffective assistance of counsel

claims. Petitioner appealed to the Supreme Court of New Jersey, which affirmed Judge Arnone's

decision. State v. Bey, 736 A.2d 469 (N.J. 1999) ("Bey V"), cert. denied, 530 U.S. 1245 (2000).

Petitioner filed a petition seeking the issuance of a writ of habeas corpus in this Court on

March 8, 2000, pursuant to 28 U.S.C. § 2254. Petitioner sought habeas relief on the following

grounds:[9]

> 12.1    Retrial Counsel's Failure To Give Petitioner His Choice Of Whether To Testify
> And/Or To Allocute At The Penalty Phase, And To Explain Those Options To
> Him, Violated His Rights Under The Fifth, Six, Eighth and Fourteenth
> Amendments Of The Constitution.

> 12.2.   The Failure Of Both Defense Counsel To Conduct A Timely and Effective
> Investigation, Their Resulting Failure to Uncover Extensive Mitigating Evidence
> That Would Have Supported Their Own Strategy, and Their Failure In Other
> Ways To Prepare and Present the Defense In A Reasonable Manner Deprived
> Petitioner Of His Sixth Amendment Right To The Effective Assistance of
> Counsel.

> 12.3    The Trial Judge's Failure To Distinguish Between Death-Eligible Murder And
> Non-Death-Eligible "Serious-Bodily-Injury" Murder At The 1984 Guilt Trial
> Violated Petitioner's Sixth, Eighth and Fourteenth Amendment Rights, And
> Retrial Counsel's Failure To Develop All The Facts Necessary To Obtain A New
> Trial On This Ground Deprived Petitioner Of The Effective Assistance Of
> Counsel.

> 12.4    The Trial Judge's Rule Forbidding Co-Counsel From Addressing Either The Jury
> Or The Judge, In Or Out Of The Jury's Presence, Constructively Denied Petitioner
> The Assistance Of Counsel Guaranteed By The Sixth Amendment Of The
> Constitution.

> 12.5    By Refusing To Instruct The Jury That The Alternative To Death Was Two

---

[9] Rather than paraphrasing Petitioner's issues, the grounds cited below directly quote the
grounds set forth in Petitioner's Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254
by State Prisoner Under Sentence of Death [hereinafter "Habeas Pet."].

Consecutive Life Sentences With An Aggregate 70-Year Mandatory Minimum, The Judge Deprived Defendant Of His Due Process Right To Rebut the State's Evidence, And Violated His Eighth and Fourteenth Amendment Rights.

12.6     The State Courts' Refusal To Permit Petitioner To Interview The Jurors, And The Court Rule That Prohibits Such Interviews Except On A Showing Of Good Cause, Violated His First Amendment Right Of Access And His Sixth Amendment Right To A Public Trial.

12.7     Petitioner's Eighth and Fourteenth Amendment Rights Were Violated When The Trial Judge Refused To Admit Important And Reliable Evidence In The Form Of Dr. Cooke's Report, And Precluded The Defense from Using The Report To Cross-Examine The State's Expert.

12.8     The Trial Judge's Prohibition of Leading Questions On Direct Examination Of Petitioner's Mother Impeded The Presentation of Mitigating Evidence, In Violation Of His Eighth and Fourteenth Amendment Rights.

12.9     The Judge Permitted The Prosecutor To Prove Uncharged, Inflammatory Aggravating Factors Through The Medical Examiner's Detailed Testimony About All The Injuries In Both the Peniston Homicide And The Prior Alston Homicide, And Through The Introduction Of The Victim's Clothing Violating Petitioner's Eighth and Fourteenth Amendment Rights.

12.10    The Prosecutor's Repeated Summation Remarks Mischaracterizing Defense Evidence And The Nature Of Mitigation In General, And Another Series Of Remarks Accusing Defense Experts Of Adjusting Facts To Support A Theory, Deprived Defendant Of Due Process Of Law And Subjected Him To Cruel And Unusual Punishment.

12.11    The Trial Judge's Instruction On The Catch-All Mitigating Factor Prevented The Jurors From Considering And Giving Effect To The Mitigating Evidence.

12.12    The Judge's Refusal To Instruct the Jury Not To Consider Evidence That Did Not Relate To The Aggravating And Mitigating Factors, And His Refusal To Explain The Limited Purpose Of The Photograph Of The Victim's Body, Failed To Direct And Limit The Jury's Discretion And Thus Permitted The Consideration Of Constitutionally Irrelevant Factors.

12.13    The Instruction On The Age Mitigating Factor Prevented The Jury From Considering And Giving Effect To Mitigating Evidence, In Violation Of The Eighth And Fourteenth Amendments.

12.14    The Retroactive Application Of The 1985 Amendment To Aggravating Factor C(4)(A) Contradicted The Legislature's Clear Intent And Violated The Ex Post Facto Clause of The Federal Constitution.

12.15    Marko Bey's Oral And Written Confession[s Were] Obtained In Violation Of His Right To Remain Silent And His Right To Due Process As Guaranteed By The Fifth And Fourteenth Amendments To The United States Constitution.

12.16    By Excusing The Only Black Juror Whom The Court Qualified For Service On Petitioner's Jury, The Prosecutor Abused His Use of Peremptory Challenges In Violation Of The Sixth And Fourteenth Amendments.

12.17    The Trial Court's Denial Of Petitioner's Motion For An Evidentiary Hearing In Which He Could Present Expert Evidence In Support Of His Challenge Of The Racial Composition Of The Petit Jury Panel Deprived Marko Bey Of His Constitutional Rights To Equal Protection And A Jury Comprised Of A Fair Cross-Section Of The Community.

12.18    Because New Jersey's Death Penalty Statute, Even As Construed, Does Not Sufficiently Limit The Class of Persons Eligible For The Death Penalty and Fails To Provide Adequate Procedures For Reviewing Capital Convictions And Death Sentences, Marko Bey Was Deprived Of Due Process Of Law And His Conviction And Death Sentence Violate The Eighth Amendment of the United States Constitution.

12.19    The Death Penalty Was Sought By the Monmouth County Prosecutor, and Imposed On Petitioner, In a Discriminatory Fashion Based On Race, In Violation of Petitioner's Right To the Equal Protection of the Laws and His Right To Be Free of Cruel and Unusual Punishment.

12.20    The Death Penalty Was Sought By the Monmouth County Prosecutor, and Imposed On Petitioner, In a Discriminatory Fashion Based On His Extreme Emotional Disturbance, In Violation of Petitioner's Right To Due Process and the Equal Protection of the Laws and His Right To Be Free of Cruel and Unusual Punishment.

On December 7, 2000, Petitioner filed a Notice of Motion to Expand Record and Motion to Interview Jurors.  This Court granted Petitioner's motion to interview members of the penalty phase jury on April 23, 2001.  Interviews of the jurors were conducted on June 29, 2001 and April 12, 2002.  On July 16, 2003, this Court granted Petitioner's motion to amend the petition

8

to include the affidavit of Dr. Paul Allison.[10]  Although this Court denied Petitioner's motion for

an evidentiary hearing on September 30, 2003, it granted Petitioner's motion to expand the

record to include the pathology report of Dr. Karl Schwarz[11] and a portion of the second affidavit

of Dr. Paul Allison.

Briefing was completed in July 2005.  Subsequently, Petitioner moved for reconsideration

of this Court's order denying Petitioner's request for an evidentiary hearing.  This Court denied

reconsideration on May 9, 2006.  Supplemental briefs and letters were submitted in 2006 and

2007.  On November 2, 2007, this Court held a full day of oral argument on four[12] of the grounds

raised in the petition.

On December 17, 2007, Governor Corzine repealed the death penalty by signing into law

L.2007, c. 204 § 1 (2007), which states that any person convicted of criminal homicide murder

"shall be sentenced by the court to life imprisonment without eligibility for parole, which

sentence shall be served in a maximum security prison," N.J. STAT. ANN. § 2C:11-3(b)(4).

Based on the commutation of Petitioner's death sentence to a sentence of life without parole,

Petitioner withdrew all claims except for Grounds 12.3 and 12.15.  (Letter from Claudia Van

Wyk to Hon. Joseph A. Greenaway, Jr. (Jan. 15, 2008).)

---

[10] Dr. Allison's affidavit addressed his statistical analysis of cases selected for capital
punishment.

[11] Dr. Schwarz's pathological report was prepared for the post-conviction hearing.

[12] Grounds 12.1, 12.2, 12.5, and 12.7 were addressed at oral argument.

**Statement of Facts**

The facts associated with Carol Peniston's murder are summarized below.  Additional

facts will be incorporated into subsequent analysis and discussion, as necessary.

On April 26, 1983, at approximately 9:20 p.m., 46-year-old Carol Peniston drove home to

Asbury Park, New Jersey from a computer class she attended at nearby Neptune High School.

(Tr. of Trial Proceedings, Sept. 25, 1984, attached as Exhibit 31 to Habeas Pet. [hereinafter "Ex.

31"] 5:23-9:10.)  When Ms. Peniston failed to show up for work the next day, her family and

friends notified the police that she was missing.  (Ex. 31 10:10–11:9.)  A week later, on May 3,

1983, police authorities in Newark notified Ms. Peniston's ex-husband that Ms. Peniston's car

had been in a one-car accident in Newark on April 27, 1983.  (Ex. 31 26:15–27:17.)  The Asbury

Park police retrieved the car from the Newark impound lot on May 4, 1983.  (Ex. 31 30:17-

30:25.)  When they processed it for evidence, Petitioner's fingerprint was found on the rearview

mirror.  (Ex. 31 112:13–16.)

Ms. Peniston was missing for several days before the authorities discovered her body.

(Ex. 31 10:5-12:3; 55:18-21.)  On May 3, 1983 at approximately 3:30 p.m., two officers from the

Asbury Park Police Department questioned Attilio (Nate) Rybot, who had found Ms. Peniston's

purse and gone to Monroe Towers[13] in an attempt to return it to her.  (Ex. 31 51:7–53:9.)  The

officers accompanied Mr. Rybot to the area where he found the purse on the 900 block of First

Avenue in Asbury Park.  (Ex. 31 53:15–55:6.)  One of the officers, Sergeant Dowling, walked

down the alleyway, climbed over a concrete loading dock, and discovered a shed.  (Ex. 31 55:11-

---

[13] Monroe Towers was the apartment building where Ms. Peniston lived.  (Ex. 31
17:11–12.)  The address was on her ID, in her purse.  (Ex. 31 53:5–9.)

10

12.)  In the shed, he found Ms. Peniston's body, which, save for the belt and scarf tied around her neck, was nude.  (Ex. 31 55:18–57:25; 60:14–16.)

On May 4, 1983, Dr. Stanley Becker, the Monmouth County medical examiner, (Tr. of Trial Proceedings, Sept. 26, 1984, attached as Exhibit 32 to Habeas Pet. [hereinafter "Ex. 32"] 3:20), autopsied Ms. Peniston's body (Ex. 32 6:4–6).  Based upon the sneaker imprint on the victim's chest, her broken ribs, and the internal hemorrhaging in her chest cavity, the medical examiner concluded that the assailant had stomped on Ms. Peniston's chest.  (Ex. 32 13:16–23; 14:24–15:12.)  Dr. Becker determined that the cause of Ms. Peniston's death was ligature strangulation, likely from the belt that had been tied around Ms. Peniston's neck.  (Ex. 32 14:13–23.)  Additionally, according to Dr. Becker, Ms. Peniston's body exhibited signs of blunt force trauma, in that Dr. Becker noticed signs of hemorrhaging on her face and a broken dental plate.  (Ex. 32 10:3–6.)

Petitioner was arrested on May 6, 1983 at his home on 443 Drummond Avenue in Neptune, New Jersey.  (Ex. 31 74:12–23.)  After being held in custody at the Asbury Park Police Headquarters for less than five hours,[14] Petitioner gave a statement to the police detailing the robbery and sexual assault and confessing to the murder of Ms. Peniston.  (Ex. 32 43:3–54:6.)

According to Petitioner, Ms. Peniston arrived home at Monroe Towers and parked her red 1979 Ford Grenada in the parking lot.  (Ex. 32 47:12–13.)  She began walking towards the building when Petitioner approached her and demanded money.  (Ex. 32 47:13–15.)  Interrupted by a person coming out of the building, Petitioner forced Ms. Peniston to walk with him for a

_____

[14] Petitioner was arrested at 5:15 p.m., and arrived at the Asbury Park Police Department at 5:35 p.m.  (Ex. 32 20:3-9.)  He began his statement around 10:00 or 10:05 p.m.  (Ex. 32 39:3.)

few blocks.  (Ex. 32 47:15–17.)  Once they reached the 900 block of First Avenue, Petitioner

forced Ms. Peniston down an alleyway and over a concrete loading dock in order to reach a two

room shed adjacent to an abandoned industrial building.  (Ex. 32 47:18–20.)

Once inside the shed, Petitioner began rifling through Ms. Peniston's pocketbook.  (Ex.

32 47:20–21.)  He ordered Ms. Peniston to disrobe and she complied, taking off her raincoat and

dress.  (Ex. 32 49:22–50:10; 85:15–19.)  When he caught Ms. Peniston looking at him, Petitioner

began to beat her.  (Ex. 32 47:22–24.)  Petitioner then sexually assaulted Ms. Peniston.  (Ex. 32

47:25–48:1.)

In the course of Petitioner's attack, Ms. Peniston suffered blunt trauma injuries to her

head, face, neck, shoulders, and chest, and internal bleeding in her head, chest, heart, and lungs.

(Ex. 32 6:11–14:12.)  Petitioner broke four of her ribs on the right side and left a sneaker imprint

in the middle of her chest.  (Ex. 32 8:19–23; 10:3–11.)  During the attack, Petitioner used Ms.

Peniston's scarf and the belt from her raincoat to strangle her.  (Ex. 32 6:15–16.)

Once Ms. Peniston was dead, Petitioner left the shed and continued looking through Ms.

Peniston's purse.  (Ex. 32 51:8–11.)  He took eight dollars, a necklace, a watch, and car keys

from Ms. Peniston.  (Ex. 32 50:14–51:11.)  Petitioner threw the jewelry away on his way back to

Monroe Towers.  (Ex. 32 51:2–7.)  Once he arrived at Monroe Towers, he stole Ms. Peniston's

car and drove approximately 40 miles to Newark to see his father.  (Ex. 32 51:12–25; 79:17–19.)

At approximately 1:47 a.m. on April 27, 1983, Petitioner crashed Ms. Peniston's car into a fence

in Newark.  (Ex. 32 52:3–6.)  He abandoned the vehicle and took the train back to Asbury Park

in the morning.  (Id.)

As discussed in detail below, this Court will deny any and all requests for relief on all

12

remaining claims and dismiss the petition.

**Legal Standard Governing Petitions for Habeas Relief Pursuant to 28 U.S.C. § 2254**

Since Petitioner's petition seeking the issuance of a writ of habeas corpus was filed after

the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 110

Stat. 1214, that statute applies to his case.  See Lindh v. Murphy, 521 U.S. 320, 326-327 (1997).

As amended by AEDPA, 28 U.S.C. § 2254 now provides, in pertinent part:

> (a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

With respect to any claim adjudicated on the merits in state court proceedings, the writ

shall not issue unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" Supreme Court precedent "if the state court applies

a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the state court

confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and

nevertheless arrives at a result different from [the Court's] precedent."  Williams v. Taylor, 529

U.S. 362, 405-6 (2000).

A state court decision "involve[s] an unreasonable application" of federal law "if the state

court identifies the correct governing legal rule from [the Supreme] Court's cases but

13

unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407-9.  To be an "unreasonable application" of clearly established federal law, the state court's application must be objectively unreasonable.  Id. at 409.  A state court decision must be more than incorrect or erroneous, it must be objectively unreasonable to warrant habeas relief.  Id. at 410; Bell v. Cone, 535 U.S. 685, 694 (2002).  In determining whether the state court's application of Supreme Court precedent was objectively unreasonable, a habeas court may consider the decisions of inferior federal courts.  Matteo v. Superintendent, 171 F.3d 877, 890 (3d Cir. 1999).

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1),[15] and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2)." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003) (citing Williams, 529 U.S. at 399).  This presumption of correctness applies to both explicit and implicit findings of fact.  Campbell v. Vaughn, 209 F.3d 280, 285-86 (3d Cir. 2000) ("[T]he Supreme Court has held that an implicit finding of fact is tantamount to an express one, such that deference is due to either determination.").

With this framework in mind, this Court turns to the specific issues raised by Petitioner.

---

[15] Section 2254(e)(1) provides that "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

14

**Petitioner's Issue No. 1**

**12.3:  The trial judge's failure to distinguish between death-eligible murder and non-death-eligible "serious bodily injury" murder at the 1984 guilt trial violated Petitioner's Sixth, Eighth, and Fourteenth Amendment rights**

Petitioner challenges the trial judge's jury instruction defining murder.  He argues that the allegedly erroneous jury instruction failed to distinguish between murder with intent to kill and serious bodily injury murder ("SBI murder") and, therefore, deprived him of due process of law. The Supreme Court of New Jersey found that this failure to distinguish between the two types of murder did not constitute an error which violated Petitioner's state Constitutional rights.

This Court concludes that the Supreme Court of New Jersey based its decision on the state constitution and state statutes, and that this Court lacks authority to review the decision, pursuant to 28 U.S.C. § 2254.  Similarly, the harmless error analysis conducted by the Supreme Court of New Jersey applied a state, not federal, standard, which this Court lacks authority to review, pursuant to 28 U.S.C. § 2254.  To the extent the Supreme Court of New Jersey applied federal law without expressly citing to federal cases,[16] this Court concludes that the application of that precedent was neither contrary to, nor an unreasonable application of, federal law.

---

[16] In a footnote in Marshall v. Hendricks, the Third Circuit noted that a state court need not cite to "a specific [federal] case name in order to apply the principles enunciated within that case.  By referring to its earlier analysis of the precise issues raised by [defendant] [in a prior decision of the Supreme Court of New Jersey] an opinion that does discuss the requirements of [the Supreme Court decision in question], in addition to other pertinent United States Supreme Court jurisprudence, . . . the New Jersey Supreme Court did all that it was required to do for us to apply AEDPA deference."  Marshall v. Hendricks, 307 F.3d 36, 83 n.35 (3d Cir. 2002).  To the extent that the Supreme Court of New Jersey applied Supreme Court of the United States precedent in Petitioner's case by applying its analysis from State v. Gerald, 549 A.2d 792 (N.J. 1988), which did discuss Supreme Court of the United States decisions, this Court concludes, as discussed below, that that decision was neither contrary to, nor an unreasonable application of, federal law.

The only federal question that the Supreme Court of New Jersey addressed directly involved the application of <u>Schad v. Arizona</u>, 501 U.S. 624 (1991) to Petitioner's claims.  As explained below, this Court concludes that the Supreme Court of New Jersey's application of that precedent was neither contrary to, nor an unreasonable application of, federal law.[17]

At Petitioner's original trial in 1984, the trial judge, relying on the language of the statute[18] in effect at the time, instructed the jury that:

> In the First Count of the Indictment the defendant is charged with murder.  And the pertinent part of the First Count in the Indictment reads as follows: That Marko Bey, on the 26th day of April, 1983 in the City of Asbury Park did commit the crime of murder in that the said Marko Bey did purposely or knowingly cause the death of or serious bodily injury resulting in the death of Carol Penniston [sic] in that the said Marko Bey committed the homicidal act of his own conduct.
>
> Murder is the unlawful killing of one person by another purposely or knowingly.  A person who commits a killing does so purposely when it is his conscious object to cause death or serious bodily injury resulting in death.  A person who commits a killing does so knowingly when he is aware that what he is doing will cause death or serious bodily injury resulting in death.  In either case, that is, whether the killing is committed purposely or knowingly, causing the death or serious bodily injury, it must be within the design or contemplation of the defendant.

---

[17] "If the petitioner's legal claims were presented but not addressed by the state courts, 28 U.S.C. § 2254(d) does not apply, and federal courts undertake a de novo review of the claim." <u>Rolan v. Vaughn</u>, 445 F. 3d 671, 678 (3d Cir. 2006).  Since this Court has concluded that the Supreme Court of New Jersey addressed Petitioner's federal constitutional claims by citing to its earlier decision in <u>Gerald</u>, de novo review is not required here.

[18] At the time of Petitioner's original trial, N.J. STAT. ANN. §§ 2C:11-3(a)(1) and (2) provided that,

> a.   Except as provided in section 2C:11-4 criminal homicide constitutes murder when:
> > (1) The actor purposely causes death or serious bodily injury resulting in death; or
> > (2) The actor knowingly causes death or serious bodily injury resulting in death.

N.J. STAT. ANN. §§ 2C:11-3(a)(1) and (2).

> Serious bodily injury means bodily injury which creates serious risk of death. You will note that I have used the words purposely and knowingly.  The nature of the purpose or knowledge with which the defendant Marko Bey acted toward the decedent, Carol Penniston [sic], is a question of fact for you, the jury, to decide. Purpose and knowledge are conditions of the mind which cannot be seen and can only be determined from inferences from conduct, words or acts.

(Tr. of Trial Proceedings, Sept. 27, 1984, attached as Exhibit 33 to Habeas Pet.

[hereinafter "Ex. 33"] 46:17-47:25.)

However, other parts of the charge were framed only in terms of murder with intent, with no mention of SBI murder.[19]  For example, later in the charge, the trial judge stated that "[t]he essential determination for you to make in regard to the charge of murder in this case is whether Marko Bey committed the killing purposely or knowingly as I have defined those terms to you. In order for you to find Marko Bey guilty of murder the State must establish beyond a reasonable doubt one:  That the killing of Carol Penniston [sic] was committed by Marko Bey and, two, that it was done purposely or knowingly as I have defined those terms for you."  (Ex. 33 49:16-25.) Further, the trial judge instructed that "[i]f, after a consideration of all of the evidence, you are convinced beyond a reasonable doubt that Marko Bey either purposely or knowingly caused the death of Carol Penniston [sic], then your verdict should be guilty."  (Ex. 33 50:10-14.)

While one part of the instructions to the jury tracked the language of N.J. STAT. ANN. §§ 2C:11-3(a)(1) and (2), the verdict sheet simply stated with respect to the first count of the indictment "[h]ow do you find as to the charge that on April 26th, 1983 Marko Bey committed

---

[19] Additionally, both counsel focused on purposely and knowingly committing murder in their closing arguments.  (See, e.g, Ex. 33 3:8; 5:15; 5:18; 5:25; 6:16-18; 12:9-10; 14:21-22; 15:15-16; 16:23; 17:5; 17:18; 29:25-30:3; 30:14-16; 31:3-13; 32:17-18; 33:10-14; 33:25-34:4.) However, the prosecutor, in connection with the description of felony murder, discussed serious bodily injury.  (Id. at 19:3-4.)  Similarly, the prosecutor mentioned the requirement of serious bodily injury when discussing the elements of robbery.  (Id. at 20:14-20.)

murder by knowingly or purposely causing the death of Carol Penniston [sic] by his own conduct?  If your answer is guilty, proceed to a consideration of the Second Count.  If your verdict is not guilty, then proceed to the next question." (Ex. 33 78:23-79:4; 87:2-:5.)  The verdict sheet continued by asking the jury to determine if Petitioner committed aggravated manslaughter or reckless manslaughter (id. at 79:5-14), as well as the other six offenses charged in the indictment (id. at 79:15-81:24; 87:7-89:16).

After the Supreme Court of New Jersey's affirmance of Petitioner's conviction and remand for a second penalty phase hearing, but before the second penalty phase hearing occurred, the Supreme Court of New Jersey decided State v. Gerald, 549 A.2d 792 (N.J. 1988).[20]  Since Petitioner's allegations of error with regard to the jury instructions revolve around the holding in Gerald, this Court will first summarize the analysis undertaken, and the conclusions reached, by the Supreme Court of New Jersey in that case.

In Gerald, the Supreme Court "conclude[d] that Article 1, paragraph 12 of our state constitution – 'cruel and unusual punishments shall not be inflicted' – affords greater protection to capital defendants than does the eighth amendment of the federal constitution."  Gerald, 549 A.2d at 811.  In fact, the Supreme Court of New Jersey observed that "the least opprobrious mental state that would sustain imposition of the death penalty under the eighth amendment is insufficient to support even a conviction for non-capital murder under our Code.  It is thus apparent that New Jersey has adopted a death-penalty statute that is narrower in its scope than is required by the eighth amendment."  Id. at 812.

The Supreme Court of New Jersey then turned to the language of  N.J. STAT. ANN.

---

[20] See supra note 5.

§ 2C:11-3(a), and observed "that the statutory provisions for purposeful and knowing murders contemplate two distinct intended results as possible elements of the crime:  the actor may intend to cause either (a) death, or (b) 'serious bodily injury resulting in death.'  [The difference] lies in the actor's state of mind at the time that the crime was committed and in the harm that he or she intended to inflict."  Id. at 814.  Ultimately, the Supreme Court of New Jersey concluded that "the infliction of capital punishment on one who does not intend his or her victim's death is a violation of our state constitutional prohibition against cruel and unusual punishment."  Id. at 815-16.

In implementing this decision, the Supreme Court of New Jersey directed that "[i]f there is sufficient evidence that a defendant may have intended only serious bodily injury, not death, the trial court must charge the jury separately on the two crimes."  State v. Rose, 576 A.2d 235, 236 (N.J. 1990).  See also State v. Coyle, 574 A.2d 951, 958 (N.J. 1990) ("if the record provides a rational basis for a jury to convict a defendant of either purposely or knowingly causing death, or purposely or knowingly causing serious bodily injury that results in death, a court must instruct the jury to specify which, if any, of those findings forms the basis for a conviction"); State v. Dixon, 593 A.2d 266, 280 (N.J. 1991) ("If required by the evidence, a jury must consider in the alternative whether defendant purposely or knowingly caused death, or purposely or knowingly caused serious bodily injury that resulted in death (SBI/second-degree murder), only the former rendering the defendant death eligible. . . . As appellate judges, our job is to ask:  did the jury, with proper instructions, answer the question that establishes death eligibility?").

Petitioner argues that, since the trial judge's instruction to the jury included the elements of knowing (capital) murder and serious bodily injury (non-capital) murder, and the jury returned

19

a general verdict of murder, there is no way of knowing whether Petitioner was, in fact, found guilty of capital murder.  (Pet'r's Mem. of Law in Support of Pet. for Habeas Corpus, vol. I (hereinafter "Pet'r's Mem. of Law I") 73-4.)  That is, according to Petitioner, he was not found guilty of every element of capital murder, as required by the Supreme Court of the United States in, among other cases, In re Winship, 397 U.S. 358 (1970)[21] and Sandstrom v. Montana, 442 U.S. 510 (1979),[22] and thus was deprived of due process.  (Pet'r's Mem. of Law I at 73.)

Petitioner concludes that, in analyzing his claim, the Supreme Court of New Jersey agreed that the jury failed to indicate whether it found the essential elements of the capital offense, but then concluded that the error was harmless.  (Id. at 73-4.)  According to Petitioner,

---

[21] Winship involved the question of "whether proof beyond a reasonable doubt is among the 'essentials of due process and fair treatment' required during the adjudicatory stage when a juvenile is charged with an act which would constitute a crime if committed by an adult."  397 U.S. at 359.  In answering that question, the Court "explicitly [held] that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  Id. at 364.

[22] Petitioner argues that the jury charge violated the teachings of Sandstrom.  Sandstrom involved a prosecution for deliberate homicide.  Pursuant to Montana law, deliberate homicide required that the killing be done "purposely or knowingly."  442 U.S. at 512.  Defendant admitted the killing, but argued that he did not do so purposely or knowingly, and was therefore guilty of a lesser offense.  The jury was instructed that "[t]he law presumes that a person intends the ordinary consequences of his voluntary acts."  442 U.S. at 513.  The Supreme Court of the United States concluded that the instruction was unconstitutional since it relieved the government of the burden of having to prove defendant's state of mind in violation of Winship.  442 U.S. at 521.  That is, Sandstrom prohibits a jury instruction from shifting the burden of proof from the government by creating a presumption that shifts to the defendant the burden of disproving an element of the crime charged.  442 U.S. at 521.

The jury charge here created no such impermissible presumption, nor did it shift any burden of proof to the defendant.  Sandstrom also addressed the question of "whether the challenged jury instruction had the effect of relieving the State of the burden of proof enunciated in Winship on the critical issue of petitioner's state of mind."  Id.  Similarly, the jury instruction here did not relieve the State from the burden of proving Petitioner's state of mind, as that requirement is defined by the Supreme Court of New Jersey.

the Supreme Court of New Jersey should have applied the standards set forth by the Supreme

Court of the United States in Stromberg v. California, 283 U.S. 359 (1931),[23] and concluded that

the error required automatic reversal.  (Pet'r's Mem. of Law I at 74.)  Thus, according to

Petitioner, the Supreme Court of New Jersey's decision was contrary to clearly established

federal law.  (Id.)  Further, Petitioner contends, the conclusion that the error was harmless was an

unreasonable application of federal law.  (Id. at 75.)

 "At the outset of our discussion, we point out that there is an answer, based on a point on

which the parties have not centered their briefs, to [Petitioner's] contention that he is entitled to

relief because of the allegedly erroneous jury instructions."  Johnson v. Rosemeyer, 117 F.3d

104, 109 (3d Cir. 1997).  The Supreme Court of the United States has "stated many times that

'federal habeas corpus relief does not lie for errors of state law.'"  Estelle v. McGuire, 502 U.S.

62, 67 (1991) (quoting Lewis v. Jeffers, 497 U.S. 764, 780 (1990)).  In fact, "it is not the

province of a federal habeas court to reexamine state-court determinations on state-law questions.

In conducting habeas review, a federal court is limited to deciding whether a conviction violated

the Constitution, laws, or treaties of the United States."  Id. at 68.  That is, "the jury instructions

. . ., even if correct under state law, would need to have relieved the state of the necessity of

---

[23] In Stromberg, the defendant was convicted of violating a California statute that
prohibited three forms of conduct.  The jury was instructed that "their verdict might be given
with respect to any one of [the three forms of conduct], independently considered."  Stromberg,
283 U.S. at 368.  That is, the instruction, like the statute, expressed the clauses defining the forms
of conduct in the disjunctive.  The Supreme Court of the United States concluded that one of the
three clauses describing the prohibited forms of conduct was invalid under the federal
constitution.  Since the verdict did not specify under which clause the jury found the defendant
guilty, the Supreme Court set aside the verdict and remanded the case because there was no way
of knowing under which clause the defendant was convicted, and therefore the conviction may
have rested upon an invalid ground.  Stromberg, 283 U.S. at 368-70.

proving an element of the offense as required by federal law or to have deprived the petitioner of a defense the state had to afford him under federal law in order to be significant in a federal habeas corpus action.  If we concluded that a petitioner could obtain habeas corpus relief without making such a showing, then district courts in habeas corpus cases would sit as super state supreme courts for the purpose of determining whether jury instructions were correct understate [sic] law with respect to the elements of an offense and defenses to it." Johnson, 117 F.3d at 110.

In the present case, there is no question that Petitioner's jury was instructed in accordance with the state law in effect at the time he committed his offense and at the time of his trial.  There is also no question that the Supreme Court of New Jersey based its decision in Gerald on the New Jersey Constitution, and not on the Constitution of the United States.  Supreme Court precedent "teaches that we should hesitate to conclude that due process bars the State from pursuing its chosen course in the area of defining crimes and prescribing penalties." McMillan v. Pennsylvania, 477 U.S. 79, 86 (1986).  Further, "it is critical to remember that the Supreme Court has made it clear that the states define the elements of state offenses." Johnson, 117 F.3d at 110.[24]  As such, this Court lacks the authority to review the Supreme Court of New Jersey's

_____

[24] In his brief submitted to the Supreme Court of New Jersey in 1991, Petitioner raised federal constitutional questions; namely, whether the erroneous instruction deprived him of "his Sixth Amendment right to have the jury determine all the elements of the crime and his Fourteenth Amendment right to not be convicted except upon proof beyond a reasonable doubt." (Br. on Behalf of Def.-Appellant, vol. I, attached as Ex. 5a to Habeas Pet. [hereinafter "Ex. 5a"] 44.)   In discussing these constitutional principles, Petitioner's brief to the Supreme Court of New Jersey intertwined federal and state decisions.  Although the Supreme Court of New Jersey rested its decision on state law principles, Petitioner did present a federal constitutional claim to that court.   "If the petitioner's legal claims were presented but not addressed by the state courts, 28 U.S.C. § 2254(d) does not apply, and federal courts undertake a de novo review of the claim." Rolan v. Vaughn, 445 F.3d 671, 678 (3d Cir. 2006).  De novo review is not required here.  As

determinations with respect to its interpretation of the state statute and state Constitution.

As to Petitioner's argument regarding the Supreme Court of New Jersey's harmless error analysis, the Third Circuit has stated that a federal court cannot dictate to a state court whether or how to apply its decisions retroactively.  Warren v. Kyler, 422 F.3d 132, 136 (3d Cir. 2005) ("'While the [Supreme] Court has concluded that some federal criminal decisions should apply retroactively, it has made clear that state courts are under no constitutional obligation to apply their own criminal decisions retroactively.'" (quoting Fiore v. White, 149 F.3d 221, 224 (3d Cir. 1998)).[25]  In Fiore, the Third Circuit explicitly acknowledged that that decision had been reversed by the Supreme Court based on the "determination that retroactivity principles were not implicated at all," following "'the Pennsylvania Supreme Court's response to a certified question that characterized [the decision in question] as a clarification of the statute, not as an announcement of a new rule of law.'"  Warren, 422 F.3d at 137 (quoting Fiore, 531 U.S. at 228).

_____

discussed below, a federal court cannot dictate how the state defines elements of a crime.  As there is no federal requirement that intent be defined in any particular manner, the State of New Jersey is free to define intent in whatever manner it sees fit.

Petitioner also argued in his brief to the Supreme Court of New Jersey that he was denied the right to have a jury unanimously decide his case.  (Ex. 5a 52.)  Petitioner acknowledged that while "New Jersey recognizes [this right], no similar requirement has been applied to the states under the Federal Constitution."  (Ex. 5a 52 (citations omitted).)  Nonetheless, Petitioner argued that in the capital sentencing context, the Supreme Court of the United States had granted certiorari in 1990 in the case of Schad v. Arizona to consider this question.  (Id.)  As discussed below, the Supreme Court of New Jersey's analysis with regard to Schad v. Arizona, 501 U.S. 624 (1991) was neither contrary to, nor an unreasonable application of, Supreme Court precedent.

[25] Recently, the Supreme Court of the United States has held that the retroactivity principles enunciated in Teague v. Lane, 489 U.S. 288 (1989) do not "constrain[] the authority of state courts to give broader effect to new rules of criminal procedure than is required by that opinion."  Danforth v. Minnesota, 128 S.Ct. 1029, 1033 (2009).  However, in Danforth, the Supreme Court referenced only the retroactive application of federal constitutional rules, not state constitutional rules.

"But we do not read that outcome to call into question the validity of the retroactivity analysis we expressed [in Fiore]."  Id.  Based on this rationale, this Court cannot dictate to the Supreme Court of New Jersey how to apply its decision in Gerald retroactively, including the type of harmless error analysis to conduct.[26]

Turning to Petitioner's federal constitutional claims, Petitioner argues that the jury instruction at issue violated the holding of Stromberg v. California.  However, in that case, the Supreme Court of the United States concluded that part of the statute in question ran afoul of the federal constitution.  Here, the Supreme Court of New Jersey explicitly found that the jury instruction would have been permissible under federal constitutional standards.  Gerald, 549 A.2d at 809-10.  As the Supreme Court of New Jersey observed, after a thorough discussion of Enmund v. Florida, 458 U.S. 782 (1982) and Tison v. Arizona, 481 U.S. 137 (1987), "as a matter of federal proportionality principles, [] capital punishment may be imposed on one who commit[ted] a homicide without the purpose or knowledge that death will result, at least to the extent that the defendant's conduct can be characterized as 'recklessly indifferent to human life.'"  Gerald, 549 A.2d at 810.

Since the Supreme Court of the United States "simply [held] that major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy

---

[26] In conducting the harmless error analysis, the Supreme Court of New Jersey began by summarizing Petitioner's arguments, namely "that this Court's standard of review for Gerald issues deprives defendants of their constitutional right to have the jury determine all the issues of the crime and to be convicted on proof beyond a reasonable doubt."  Bey III, 610 A.2d at 825.  In his brief to the Supreme Court of New Jersey, Petitioner based his argument on this point on both the New Jersey Constitution and the Constitution of the United States (Ex. 5a 44-50).  However, in light of the jurisprudence evolving from Gerald, and its progeny, this Court believes that the Supreme Court of New Jersey relied solely upon the New Jersey Constitution when making this statement and conducting the attendant analysis.

the Enmund culpability requirement," Tison, 481 U.S. at 158, this Court agrees with the Supreme Court of New Jersey that the statute, and consequently the jury instruction, would have been acceptable under the federal constitution.  That is, Supreme Court of the United States precedent, in effect at the time Petitioner's case was decided, allowed that a defendant could be found guilty of capital murder simply based on his participation in a felony, without focusing primarily on the defendant's intent to murder, so long as the defendant also exhibited a reckless indifference to human life.  The Supreme Court of the United States held "that the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result." Tison, 481 U.S. at 157-58.

All three of the actions – strangling, violently striking, and stomping on his victim's chest – Petitioner took "carry a grave risk of death."  As such, Petitioner could be found guilty of capital murder without violating a federal constitutional right even in the absence of an explicit finding of intent to murder since his conduct could easily be described as demonstrating "reckless indifference to human life."  As the jury instruction, on its face, did not violate the federal constitution, habeas relief will not be granted on this basis.[27]

The sole federal legal issue directly addressed by the Supreme Court of New Jersey involved that court's application of the Supreme Court of the United States' decision in Schad v.

---

[27] Petitioner also argues that, since the jury did not find that he intended to kill Ms. Peniston, he was not found guilty of every element of murder, as required by Winship.  However, this Court need not reach this argument since, as noted previously, the element of intent was not required by federal constitutional law.

Arizona, 501 U.S. 624 (1991) to Petitioner's argument that the jury charge was defective since it did "not guarantee that the jurors unanimously agree[d] on whether the defendant committed the murder knowingly or committed it purposely."  Bey III, 610 A.2d at 825.  In Gerald, the Supreme Court of New Jersey had "treat[ed] knowing murder and purposeful murder as equivalent expressions of moral culpability."  Id. at 826.  This conclusion comported with the Supreme Court of the United States' conclusion in Schad v. Arizona, that "[i]f a State's courts have determined that certain statutory alternatives are mere means of committing a single offense, rather than independent elements of the crime, we simply are not at liberty to ignore that determination and conclude that the alternatives are, in fact, independent elements under state law."  Schad, 501 U.S. at 636.  However, this deference is not unlimited.

The Supreme Court of the United States continued by setting forth certain criteria to consider in determining whether the state's definition unconstitutionally shifted the burden of proof in violation of due process.  "Where a State's particular way of defining a crime has a long history, or is in widespread use, it is unlikely that a defendant will be able to demonstrate that the State has shifted the burden of proof as to what is an inherent element of the offense, or has defined as a single crime multiple offenses that are inherently separate."  Schad, 501 U.S. at 640. In Gerald, the Supreme Court of New Jersey analyzed the history of the murder statute, including the use of the words purposeful and knowing, and concluded that the two terms were equivalent. Gerald, 549 A.2d at 814-18.

As a result, the conclusion reached in Bey III that "knowing murder and purposeful murder [are] equivalent expressions," as required by Schad v. Arizona, is neither contrary to, nor an unreasonable application of, federal law as set forth by the Supreme Court.

**Petitioner's Issue No. 2**

**12.3:  Retrial counsel's failure to develop all the facts necessary to obtain a new trial based on the Supreme Court of New Jersey's decision in <u>State v. Gerald</u> deprived Petitioner of the effective assistance of counsel**

In February 1990, Petitioner's counsel filed a motion seeking a new guilt-phase trial based on the Supreme Court of New Jersey's holding in <u>State v. Gerald</u>, 549 A.2d 792 (N.J. 1988).  (Ex. 39 2:5–14:16.)  In the motion, Petitioner's counsel argued that the jury was not instructed on the difference between the two types of murder.  (Ex. 39 11:12-16.)  Had the jury been instructed properly, Petitioner's counsel continued, they only would have convicted Petitioner for knowingly causing "serious bodily injury resulting in death."  (Ex. 39 7:13–19.)

In drafting this motion, Petitioner's counsel relied exclusively on the testimony of Dr. Stanley Becker, the State's medical examiner, and the autopsy report which had been introduced at trial.  (Pet'r's Br. 54.)  Based on his examination, Dr. Becker concluded that Ms. Peniston died due to ligature strangulation.  (Ex. 32 14:13–23; Tr. of Trial Proceedings, Aug. 29, 1990, attached as Exhibit 48 to Habeas Pet. [hereinafter "Ex. 48"] 96:25.)  The trial court denied the motion, noting that in Petitioner's case — unlike <u>Gerald</u> — the cause of death was clear.  That is, "the jury could only have concluded that the defendant knowingly and purposely caused death — death by strangulation."  (App. Vol. I 101a.)

Petitioner now contends that counsel was ineffective in not seeking out the opinion of an independent pathologist.  (Pet'r's Br. 54.)  In support of this argument, defendant points to the report of Dr. Karl Schwarz, a pathologist from the Robert Wood Johnson Medical School, who reviewed the evidence in the case during his preparation for the 1997 post-conviction relief

hearing.[28]  (Id.)  In Dr. Schwarz's report, he disagreed with Dr. Becker, arguing that Ms. Peniston's death could have been caused by any one of the three major injuries that she sustained — blunt force trauma to the head, blunt force trauma to the chest, or ligature strangulation. (Report & Curriculum Vitae for Dr. Karl O. Schwarz, Apr. 10, 1995, attached as Pet'r's App. in Supp. of Pet. for Habeas Corpus Vol. II [hereinafter "Schwarz Report"] 102a–103a.)

Petitioner argues that the trial court would have granted the motion for a new trial based on Gerald if evidence such as Dr. Schwarz's report had been presented to the court. (Pet'r's Br. 58.)  Petitioner argues that evidence akin to Dr. Schwarz's report would have drawn into doubt the ability of a reasonable jury to find the defendant guilty of purposely or knowingly killing Ms. Peniston.  (Id. at 56–58.)  In response, the State argues that Petitioner's intent to take Ms. Peniston's life was clear to the jury, regardless of whether an obvious cause of death presented itself or not.  (Resp't's Br. 41.)

In reviewing this claim, the Supreme Court of New Jersey held that "[e]ven if [Petitioner's counsel] should have sought a second opinion from a pathologist, such testimony would not have affected the outcome of the Gerald motion for a new trial. . . . Thus we find no prejudice to the defendant."  Bey V, 736 A.2d at 497.  This Court, during its review of Petitioner's claims, must first ask if the state court correctly identified the applicable law, and, second, whether the state court's application of that law was an unreasonable application of, or contrary to, federal law.

---

[28] Dr. Schwarz did not testify at the 1997 hearing.  (Pet'r's Br. 55.)  While the Supreme Court of New Jersey made reference to Dr. Schwarz's report, Bey V, 736 A.2d at 497, it appears that the report was not part of the official record at the time.  This Court expanded the record to include the report in its entirety.  (Order dated Sept. 30, 2003.)

The Supreme Court of New Jersey applied the standard set forth in Strickland v. Washington, 466 U.S. 668 (1984), when it denied Petitioner's claim for relief on this ground. Bey V, 736 A.2d at 478.  It is "well-settled that 'the legal principles that govern claims of ineffective assistance of counsel [were established by the familiar two-pronged test of] Strickland.'"  Outten v. Kearney, 464 F.3d 401, 414 (3d Cir. 2006) (quoting Wiggins v. Smith, 539 U.S. 510, 521 (2003)).  And, it is "past question . . . Strickland qualifies as 'clearly established [f]ederal law, as determined by the Supreme Court of the United States.'"  Id. (quoting Williams v. Taylor, 529 U.S. at 391).  This Court concludes that the Supreme Court of New Jersey identified the correct legal standard in this case.

The Strickland standard has two prongs, conjunctive in their application, which Petitioner must satisfy in order to establish a claim of ineffective assistance of counsel.  First, Petitioner had to demonstrate that, "in light of all the circumstances, [counsel's actions] were outside the wide range of professionally competent assistance."  Strickland, 466 U.S. at 690.  Second, Petitioner had to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id. at 694.  That is, under Strickland, Petitioner had to convince the court that "there is a reasonable probabiltiy that, but for counsel's unprofessional errors, the result of the . . . proceeding would have been different."  Id.; Rolan v. Vaughn, 445 F.3d 671, 682 (3d Cir. 2006) (citing Hull v. Kyler, 190 F.3d 88, 110 (3d Cir. 1999)) (defining reasonable probability as "a probability sufficient to undermine confidence in the

outcome"). The Supreme Court has directed that these prongs may be addressed in either order.[29]

In its decision, the Supreme Court of New Jersey held that Petitioner had not suffered any prejudicial effects as a result of counsel's actions, thereby avoiding any discussion of the first Strickland prong. Bey V, 736 A.2d at 284–85. That court held that "[e]ven if [Petitioner's counsel] should have sought a second opinion from a pathologist, such testimony would not have affected the outcome of the Gerald motion for a new trial." Id. The court continued, concluding that "the evidence that Petitioner intended to cause death or knew that death was practically certain to occur is so compelling as to exclude the possibility that he possessed a less culpable state of mind." Id. (citing Bey III, 610 A.2d at 825). This Court concludes that the Supreme Court of New Jersey's application of the Strickland standard was neither an unreasonable application of, nor contrary to, federal law.

Assuming, arguendo, that the jury had been presented with evidence akin to Dr. Schwarz's report, the jury would have been informed that Ms. Peniston may have died after

---

[29] In articulating its standard in Strickland, the Supreme Court noted that:

> Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result.

Strickland, 466 U.S. at 697.

being strangled with her scarf and the belt from her coat; that Ms. Peniston may have died from Petitioner bludgeoning her over the head with a wooden beam hard enough to crack a dental plate; or that she may have died after Petitioner stomped on her chest with enough force to break several ribs and permanently brand the pattern from the sole of his shoe into her skin.

Petitioner argues that the lack of a single cause of death would have caused the jury to conclude that Petitioner did not intentionally cause Ms. Peniston's death.  The Supreme Court of New Jersey disagreed, concluding that no reasonable jury, when presented with multiple potential causes of death, all of which were violent, could have concluded that Petitioner did not intend to kill Ms. Peniston.  Id.  That is, the Supreme Court of New Jersey concluded that a single clear cause of death was not necessary in order for a jury to decide that the death was intentional. "When a defendant employs various means of violence against the same victim, we need not focus on which method actually succeeded in causing death.  Rather, we find that defendant's actions, taken as a whole, were so wantonly brutal that he could have intended only to cause death, or knew that death was practically certain to occur." Bey III, 610 A.2d at 825.

This Court lacks the authority to review this particular conclusion given that it was based on New Jersey state law; namely, the line of cases interpreting and applying the Supreme Court of New Jersey's decision in Gerald.  Estelle v. McGuire, 502 U.S. 62, 67–68 (1991) ("'[F]ederal habeas corpus relief does not lie for errors of state law.' . . . [I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." (quoting Lewis v. Jeffers, 497 U.S. 764, 780 (1990))).

31

According to the Supreme Court of New Jersey, it would have made no difference if Petitioner's counsel had presented the trial court with something akin to Dr. Schwarz's report — or the report itself — given that the ultimate outcome would have been the same. As a result, Petitioner's counsel was not ineffective for failing to provide an additional report in support of his motion for a new trial. In reaching this conclusion, the Supreme Court of New Jersey applied Strickland, ultimately concluding that the second prong — a showing of prejudice to Petitioner as a result of counsel's allegedly ineffective assistance — was not satisfied. Since both prongs of Strickland must be satisfied, and the two prongs can be considered in any order, the Supreme Court of New Jersey did not, nor did it need to, go on to consider the other prong of Strickland.

This Court holds that the Supreme Court of New Jersey correctly identified the appropriate legal standard, namely Strickland. The Supreme Court of New Jersey also correctly applied that standard when it concluded that Petitioner's intent to kill was clearly established by the evidence, and thus, counsel's failure to seek an independent pathological report did not prejudice Petitioner. As a result, Petitioner failed to satisfy the second prong of the Strickland test. Thus, this Court finds that the Supreme Court of New Jersey's conclusion is not contrary to, nor an unreasonable application of, the well-established Strickland standard.

**Petitioner's Issue No. 3**

**12.15:  Petitioner's oral and written confessions were obtained in violation of his right to remain silent and his right to due process as guaranteed by the Fifth and Fourteenth Amendments**

Petitioner further seeks the issuance of a writ of habeas corpus based on the assertion that his confession was taken in violation of his right to remain silent. Petitioner argues that according to Miranda v. Arizona, 384 U.S. 436 (1966), the police should have ceased their

32

interrogation efforts once Petitioner asserted his desire to "lay down so that he could think about what happened," (Tr. of <u>Miranda</u> Hearing, November 2, 1983, attached as Ex. 22 to Habeas Pet. [hereinafter "Ex. 22"] 43:6–9), and that the Supreme Court of New Jersey's holding to the contrary was contrary to, or an unreasonable application of, established federal law, as determined by the Supreme Court of the United States.  (Pet'r's Mem. of Law in Supp. of Pet. for Habeas Corpus vol. II [hereinafter " Pet'r's Mem. of Law II"] 191, 197–99.)

On the other hand, Respondents assert that no Supreme Court precedent sets forth what an "expression indicat[ing] a desire to 'cut off questioning'" is.  (Br. & App. on behalf of Resp'ts in Opp'n to Pet. for Habeas Corpus Vol. II [hereinafter "Resp'ts Br. II"] 150.)  Thus, Respondents aver that the Supreme Court of New Jersey's decision was neither contrary to, nor an unreasonable application of, established federal law, as determined by the Supreme Court of the United States.

The factual background[30] of this claim was summarized by the Supreme Court of New Jersey in <u>Bey II</u>, 548 A.2d at 891:

> On May 6, Detective Musiello of the Asbury Park Police Department signed a complaint against [Petitioner] charging him with receiving stolen property, Ms. Peniston's Ford Granada. Later that day, at approximately 5:15 p.m., five law enforcement officials from Neptune, Asbury Park, and the Monmouth County Prosecutor's Office arrested [Petitioner] at his home in Neptune. They handcuffed [Petitioner] and took him to the Asbury Park police headquarters, and at approximately 5:35 p.m. placed him in the custody of

---

[30] Judge Arnone held a single <u>Miranda</u> hearing for both the Peniston and Alston murders, which was conducted prior to the trial in the Alston case.  (Ex. 22.)  The trial judge's findings of fact were directed at the events leading up to Petitioner's confession to the Alston murder.  As a result, the Supreme Court of New Jersey invoked its authority under N.J. Cᴛ. R. 2:10-5 and engaged in fact finding prior to making its legal conclusions.  Pursuant to 28 U.S.C. § 2254(e)(1), these factual findings are afforded a presumption of correctness.  Petitioner has the burden of rebutting this presumption by clear and convincing evidence, which he has failed to do.

Detective Musiello and Investigator George of the Monmouth County Prosecutor's Office.

[Petitioner] was placed in an office at police headquarters and given a copy of the complaint. Detective Musiello read to [Petitioner] a Miranda warning card, and [Petitioner] signed an acknowledgment on the reverse side indicating that he had been advised of those rights. When asked if he wished to see anyone, [Petitioner] declined. He was then interrogated concerning his possession of the victim's automobile, during which interrogation he gave conflicting accounts of his activities. The State asserts, but [Petitioner] denies, that he was asked at 6:00 p.m. whether he wanted something to drink or to go to the bathroom. About 6:30 p.m., at his request, [Petitioner] was given a soda. While he was drinking the soda, [Petitioner] stated: "No matter what I say I'm going to be charged with this offense," a statement that referred, according to the State, to the automobile theft charge. The interrogation continued until 7:15 p.m., when [Petitioner] was given time to eat dinner. The questioning resumed twenty minutes later at 7:35 p.m., and lasted until 8:20 p.m., when [Petitioner] went to the bathroom and was given cigarettes and a soda. On [Petitioner]'s return to the interrogation room, [Petitioner] and Investigator George, the interrogating officer, sat in silence for five minutes. [Petitioner] asserts that during this time he may have been crying.

The trial court found that five minutes later, at 8:30 p.m., [Petitioner] said he wanted to lie down so that he could think about what happened. [Petitioner] did not expressly state that the questioning should end. Although the brief in support of [Petitioner]'s motion to suppress stated that his request to lie down constituted an invocation of his right to remain silent, [Petitioner] did not urge that point at the Miranda hearing. In fact at that hearing [Petitioner] testified that it was the police who asked whether [Petitioner] wanted to lie down.

In any event, [Petitioner] was placed in the Asbury Park municipal jail for about one hour. When he returned to the detective bureau at approximately 9:30 p.m., he was not given a new set of Miranda warnings, but was asked if he wished to communicate with anyone. He declined. Questioning resumed and continued until about 10:05 p.m., when [Petitioner] confessed to the crime. Approximately fifty minutes later, [Petitioner] was again read his Miranda rights, which he waived. He then gave a written statement, in which he admitted that he accosted Ms. Peniston in front of her apartment building and demanded money from her. The statement continued that when he heard someone coming, he grabbed her and led her to the shed. In the ensuing events, he repeatedly struck Ms. Peniston, sexually assaulted her, and took eight dollars as well as the car keys from her pocketbook. While on his way to Newark in her car, he collided with an iron fence alongside a graveyard, and abandoned the car.

34

Petitioner asserts that the police obtained his oral and written confessions, in violation of his Fifth and Fourteenth Amendment rights.  (Pet'r's Mem. of Law II 185.)  Specifically, Petitioner alleges that the police obtained the confessions in violation of his invoked right to remain silent, as interpreted in Miranda v. Arizona, 384 U.S. 436 (1966), and Michigan v. Mosley, 423 U.S. 96 (1975).  (Pet'r's Mem. of Law II 190.)  As such, Petitioner claims that the Supreme Court of New Jersey erred in affirming the admission of his written and oral confessions because they were obtained in violation of his Fifth Amendment right to remain silent.  This assertion rests on Petitioner's claim that both the five minute silence between the Investigator George and himself, as well as his request to "lie down and think about what happened," were invocations of his right to remain silent.  (Pet'r's Mem. of Law II 198.)

The Third Circuit has held that "[t]he ultimate question of voluntariness of a Miranda waiver is subject to plenary review."  United States v. Pruden, 398 F.3d 241, 245-46 (3d Cir. 2005) (citing Ahmad v. Redman, 782 F.2d 409, 413 (3d Cir. 1986)); see also Mercado v. Vaughn, 36 F. App'x 684, 686 (3d Cir. 2002) ("Whether a defendant has voluntarily waived his Miranda rights 'is a mixed question of law and fact, subject to plenary review by federal habeas courts.'" (quoting Alston v. Redman, 34 F.3d 1237, 1253 (3d Cir. 1994))).  Thus, Petitioner's claim fails unless this Court determines that the Supreme Court of New Jersey's decision on the admissibility of the confessions was "contrary to, or involved an unreasonable application of, clearly established Federal law, as established by Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

When analyzing a claim, pursuant to § 2254(d)(1), a court must first determine relevant federal law, as established by the Supreme Court of the United States.  See Yarborough v.

35

Alvarado, 541 U.S. 652, 660 (2004).  The state courts correctly found that whether Petitioner's

confession is admissible under the Fifth Amendment is governed by Miranda v. Arizona, 384

U.S. 436 (1966), and by Michigan v. Mosley, 423 U.S. 96 (1975).  Bey II, 548 A.2d at 892.

According to Miranda, every person being questioned by the police should be appropriately

warned of their right to counsel and the availability of court-appointed counsel.  Miranda, 384

U.S. at 473.

Miranda also emphasized the procedural protections to be afforded to individuals in

effectuating those rights.  For example, "if the individual indicates in any manner, at any time

prior to or during questioning, that he wishes to remain silent, the interrogation must cease."  Id.

at 473–74.  Should the interrogation continue after this point, the court will view the confession

or subsequent statements as "the product of compulsion."  Id. at 474.  The Supreme Court

elaborated on this language, in Michigan v. Mosley, stating that "admisissibility . . . depends . . .

on whether [the individual's] 'right to cut off questioning' was 'scrupulously honored.'"  Mosley,

423 U.S. at 103-4.

The Supreme Court of New Jersey recognized that, pursuant to Miranda and Mosley, "the

question [was] whether [Petitioner]'s request to lie down and think about what happened

constituted an invocation of his right to terminate questioning."  Bey II, 548 A.2d at 894.  After

due consideration, the Supreme Court of New Jersey determined that, based on established

federal law, "the record, cold as it is, supports beyond peradventure the conclusion that

[Petitioner] did not intend to cut off questioning and remain silent."  Id. at 895.  Additionally, the

Supreme Court of New Jersey noted that "[Petitioner] merely communicated his desire to spend

some time thinking about the events that were the subject of the interrogation.  He did not ask for

36

an attorney or refuse to sign a waiver of his rights.  Similarly, he did not refuse to continue  the

questioning, and did not indicate in any manner that he wanted to end the interrogation." Id. at

894.

This Court holds that the Supreme Court of New Jersey's conclusions were neither

contrary to, nor an unreasonable application of, federal law, as stated by the Supreme Court of

the United States.  At their core, both Miranda and Mosley stand for the proposition that police

can no longer question an individual in custody once that individual asserts his right to remain

silent.  Miranda, 384 U.S. at 473–74; Mosley, 423 U.S. at 104.  However, both cases require an

assertion of the right on the part of the individual, and not a mere request for introspection.

Hence, this Court finds that the Supreme Court of New Jersey's conclusion that "only in some

abstract sense apart from the facts of the case . . . could defendant's [request to 'lie down and

think about it'] be construed as an assertion of the right to remain silent," Bey II, 548 A.2d at

895, was neither contrary to, nor an unreasonable application of, federal law, as stated by the

Supreme Court of the United States in Miranda and Mosley.

This Court is also mindful of the Supreme Court of New Jersey's observation that

"[Petitioner]'s own testimony repudiates [his] argument."  Id. at 896.  That is, Petitioner "denied

seeking permission to lie down, and asserted instead that it was the police who asked him if he

wished to 'lie down and think about it.'"  Id. at 895–96; (Ex. 22 157:11–18).  According to

Petitioner's own testimony, then, the decision to lie down and think was less an affirmative

request for introspection, and more akin to a passive acquiescence, on his part, to a suggestion

from the police officers.  Under such a scenario, the Supreme Court of New Jersey's conclusions

are certainly neither contrary to, nor an unreasonable application of, the Miranda and Mosley

37

standards.

Finally, this Court notes that the Supreme Court of New Jersey, in reaching its conclusion, carefully contemplated the distinction between an affirmative assertion of a right to remain silent and a passive acquiescence to a suggestion.  That much is evidenced by the Supreme Court of New Jersey's discussion, in <u>Bey II</u>, 548 A.2d at 895, comparing the circumstances surrounding Petitioner's confession to the murder of Ms. Peniston and Petitioner's confession to the murder of Cheryl Alston:

> At the police station, [Petitioner] did not refuse to answer questions about the Peniston murder.  His posture in that regard stands in sharp contrast to his later refusal to discuss the murder of Cheryl Alston.  As Investigator George testified at the suppression hearing on [Petitioner]'s confession to the Alston murder, at the outset, [Petitioner] "indicated he did not want to talk to us about it."  [(Ex. 22 51:10–51:13.)]  [Petitioner]'s subsequent assertion of his constitutional right to terminate questioning about another murder does not invalidate his earlier voluntary confession to the murder of Carol Peniston.

This excerpt exhibits that the Supreme Court of New Jersey was mindful of the need to "scrupulously honor" Petitioner's right to remain silent.  However, that court reasonably determined that Petitioner had not invoked his right to silence at any time during his questioning in connection with the stolen car and the murder of Ms. Peniston.  The above discussion further underscores this Court's conclusion that the Supreme Court of New Jersey's application of the <u>Miranda</u> and <u>Mosley</u> standards was neither contrary to, nor an unreasonable application of, federal law, as stated by the Supreme Court of the United States.

**<u>Conclusion</u>**

For the reasons discussed above, this Court concludes that the Supreme Court of New Jersey correctly identified, and applied, the relevant federal law to each of the three claims that Petitioner advances.  This Court finds that the Supreme Court of New Jersey's decision resolving

38

Petitioner's claim of erroneous jury instructions was neither contrary to, nor an unreasonable application of, federal law, as stated by the Supreme Court of the United States.  Likewise, this Court finds that the Supreme Court of New Jersey's ruling regarding Petitioner's claim of ineffective assistance of counsel was neither contrary to, nor an unreasonable application of, federal law, as stated by the Supreme Court of the United States.  Finally, the Supreme Court of New Jersey's holding, with respect to Petitioner's claim of a <u>Miranda</u> rights violation, was neither contrary to, nor an unreasonable application of, federal law, as stated by the Supreme Court of the United States.

This Court will deny Petitioner's application seeking the issuance of a writ or habeas corpus.

Dated: July 21, 2009                    <u>S/Joseph A. Greenaway, Jr.</u>
                                        JOSEPH A. GREENAWAY, JR., U.S.D.J.